**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-317 (TSC)** |
| **v.** | : | |
| | : | |
| **KASEY HOPKINS,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Kasey Hopkins to 4 months' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Kasey Hopkins, a 48 year-old roofer from Kansas City, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million dollars in losses.[1]

On December 20, 2022, defendant Hopkins pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 4 months incarceration and a 36-month term

---

[1]       The Statement of Offense in this matter, filed on December 20, 2022, (ECF No. 22 at ¶ 2) reflects a sum of more than $1.4 million dollars for repairs. As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

of probation is appropriate in this case because Hopkins: 1) has a significant criminal history, including a 2002 conviction for forcible rape; 2) briefly entered the Senate Parliamentarian's Office which was thoroughly ransacked that day by other rioters; 3) entered a sensitive area on the first floor of the Capitol, namely Senator Jeffrey Merkley's hideaway office, where he observed and took pictures of other rioters ransacking the office; 4) entered the Capitol twice; 5) minimized his conduct in his interview with the FBI.

The Court must also consider that Hopkin's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt Congressional proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification proceedings.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), at 1-3.

### *Defendant Hopkins' Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Kasey Hopkins flew to Washington, D.C. from his home in Kansas City, Kansas, to attend the "Stop the Steal" rally. Prior to traveling, on January 3, 2021, Hopkins solicited another individual (Person 1) to travel with him and discussed the potential of a "Civil War." He even proposed forming a group of "Proud Felons for Trump" when he heard the Proud Boys might not accept men with felony convictions.

| Hopkins: | What up mike. I'm leaving for DC tomorrow from KC. I'll be driving. If you know anybody that wants to roll let me know. |
|---|---|
| Person 1: | I'm jealous I want to punch Antifa |

2

| Hopkins: | Let's roll<br>Pack a bag man |
|---|---|
| Person 1: | I can't do it because of my work schedule.<br>New job |
| Hopkins: | I'll send you some pictures |
| Person 1: | Cool. I am ready for the Civil War and will definitely take off work for that. Proud of you for going there now. |
| Hopkins: | Civil war would suck! However, if shit gets outta hand we've gotta plan. Hope you do too! |
| Person 1: | I have been on several groups and have said that I would organize militia and got comments about not saying anything on Facebook and I fuck that I want my enemy to know who I am<br><br>Tried joining the Proud Boys online and got crickets |
| Hopkins: | Really...didn't even know that was a online thing |
| Person 1: | When Trump debated and the first time I ever heard of them and I looked up the proud boys website and found out that they were just guys like us wanting to protect our country and they had a section for joining and I even wrote a letter asking if I could join even though I was a felon because they are like the Knights Templer and Very uppity |
| Hopkins: | We should start a PFFT<br>Proud Felons For Trump |

After attending the former President's rally, Hopkins walked to the Washington Monument. According to a statement Hopkins gave to law enforcement (discussed below), while there, he observed another individual with a noose. Hopkins then walked to the Capitol, and described the scene as a bunch of pirates who had overtaken a ship, and that it was anarchy and chaos.

At approximately 2:54 p.m., Hopkins entered the Capitol through a fire door near the Senate Parliamentarian's Office. *Id*. at ¶ 8. Hopkins can be seen recording the unfolding events

with his phone, including his own brief entry into the Senate Parliamentarian's Office. Hopkins

exited the building through the same door he entered approximately three minutes later.



*Image 1* – Hopkins enters the Senate Parliamentarian's Office

Rather than leave the Capitol, Hopkins re-entered the Capitol through the nearby Senate

Wing Door. When Hopkins re-entered at approximately 3:06 p.m., the windows next to the Senate

Wing Door had been broken and furniture was overturned in the lobby.



*Image 2* – Hopkins enters through the Senate Wing Door

Hopkins walked down the hallway in the upper left of Image 2, and entered the private hideaway office of Senator Jeffrey Merkley. Although the "hideaway" office was not marked as the office of a United States Senator or any other person, it was clearly recognizable as a private office. Inside, there was a crowd of people ransacking the office and smoking marijuana. There was an individual in a chair wearing a false beard (Brandon Fellows, the defendant in case 21-CR-83). Hopkins took a picture of Fellows using Fellows' phone. An individual "live-streaming" from inside the office (the video from which Images 3 and 4 are taken) described it as an "office" and a person can be heard stating that it smells of teargas. Hopkins is also in this brief video. Persons also are observed smoking marijuana and one individual appears to be rolling up a poster that was taken from the office.



*Image 3 (cropped)* – Hopkins takes a picture of Fellows



*Image 4* – Hopkins in Senator Merkley's Office

After exiting Senator Merkley's office, Hopkins continued walking through the Capitol. Hopkins entered the Crypt and stopped by a bust of Winston Churchill to take a picture near the Memorial Door. Hopkins eventually made his way back to the Senate Wing Door and exited through the same door he entered (the second time) at approximately 3:15 p.m. Hopkins remained on the Capitol Grounds at least until 4:02 p.m., per the time stamp on a photograph from Hopkins' iCloud account.

*Hopkins' Pre-arrest Interview with the FBI*

On September 14, 2021, Hopkins gave a voluntary pre-arrest interview to the FBI in which he minimized his own conduct. Towards the end of the interview, when asked if he entered the Capitol, Hopkins told the interviewing agents that if there was video of him at the Capitol, they would observe a "shocked expression" on his face.[2] In that answer, Hopkins did not deny entering but neither did he admit it.

During the interview, he admitted traveling to Washington and acknowledged that he knew that the certification of the Electoral College votes was scheduled to occur on January 6, 2021. He acknowledged attending the rally at the Ellipse and that he heard the former President state that "this is war," although Hopkins did not interpret that as a command to storm the Capitol. After attending the rally, Hopkins stated he went to the Washington Monument, where he observed an individual with a noose, and that people were praying stating, "the end is near."

Arriving on the Capitol grounds, Hopkins described that "his mind was blown," and that the scene was like a "bunch of pirates who had taken over the ship." Hopkins observed that he saw

---

[2] The United States has not identified any such video in which Hopkins appears perturbed or shocked by the events unfolding around him.

human feces on the ground outside the Capitol as he was leaving. Hopkins stated that he did not observe any police waving people inside the Capitol.

At a post-plea debrief, Hopkins admitted to his conduct and admitted to being inside the U.S. Capitol. Hopkins complied with the terms of the plea agreement's debrief requirement.

*The Charges and Plea Agreement*

On August 4, 2022 the United States charged Hopkins by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). ECF No. 1. On August 5, 2022, law enforcement officers arrested him at his home in Kansas. On September 22, 2022, the United States charged Hopkins by a four count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).[3] ECF No. 16. On December 20, 2022, pursuant to a plea agreement, Hopkins pleaded guilty to Count Four of the Amended Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol. ECF No. 23 at 6.

### III.    Statutory Penalties

Hopkins now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

---

[3] On October 7, 2022, the United States filed an Amended Information only amending the defendant's name.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 4 months' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

A.   **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp. 3d 1, 8 (D.D.C. 2021). While assessing Hopkins' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Hopkins, the absence of violent or destructive acts is not a mitigating factor. Had Hopkins engaged in such conduct, he would have faced additional criminal charges.

Two of the most important factors in Hopkins' case is that he entered the Capitol twice, and he entered private office spaces. Hopkins first entered through a fire door near the Senate Parliamentarian's Office. While accompanying a large crowd inside, Hopkins appeared to be

recording with his phone, and briefly entered the Senate Parliamentarian's Office. After walking further down a crowded hallway, Hopkins turned around and exited. Rather than have misgivings after his first entry, it appears that Hopkins was instead frustrated in his efforts to make headway through the Capitol building and sought out an easier entrance.

Thus, minutes later, Hopkins entered the Capitol a second time—this time through the Senate Wing Doors, where the windows next to the doors were broken and furniture was toppled over. Hopkins spent the largest amount of time in any one place inside the office of Senator Merkley. While inside that office, there was chaotic yelling, people smoking marijuana, a person appearing to be rolling up a poster from the office, and a person discussing teargas. Rather than appearing "shocked," as Hopkins said he was in his pre-arrest interview, Hopkins gamely took a picture for another rioter (Brandon Fellows).

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 4 months incarceration and a 36-month term of probation in this matter.

**B.  Hopkin's History and Characteristics**

As set forth in the Presentence Investigation Report ("PSR"), Hopkins has a lengthy and troubling criminal history dating back to 1994. PSR ¶¶ 27-44. Most notably, Hopkins was convicted in 2002 for forcible rape for which he was sentenced to 7 years' incarceration. *Id*. at ¶ 35. As described in the PSR, the defendant had forcible intercourse with the victim, choked her to the point of impairing her vision, banged her head into a wall, and urinated into the victim's mouth to humiliate her. When the victim attempted to flee, naked, the defendant caught up to her and threw her down; neighbors attempted to intervene.

Hopkins also has at least 8 other convictions, for offenses such as assault on a law enforcement officer, assault in the third degree, operating a motor vehicle without a license,

possession of a controlled substance, and non-support. For the non-support conviction, the defendant was incarcerated for a period of 4 years, which appears to have been concurrent with the period of incarceration for the forcible rape charge.

Many of these convictions contained periods of supervision, during which Hopkins was convicted of additional crimes. For instance, while on probation for an assault on a law enforcement officer (PSR ¶ 28), Hopkins was convicted of another assault (PSR ¶ 29), a third assault (PSR ¶ 30), operating a motor vehicle without a license (PSR ¶ 31), possession of a controlled substance (PSR ¶ 32), and a second offense of operating a motor vehicle without a valid license (PSR ¶ 33). For the second operating without a valid license offense, the defendant was also put on a two-year term of probation, which was later revoked. Most recently, Hopkins completed a 12 month diversionary program for a domestic assault charge in 2012. PSR ¶ 42.

As the PSR notes, Hopkins is employed and has owned his own company since 2016, and appears to have been employed since at least 2011.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Hopkins entered the Capitol twice after its initial breach, despite seeing broken glass and toppled furniture, hearing alarms, and witnessing other rioters enter private office spaces. Moreover, Hopkins' lengthy and serious criminal history, including his history of committing new crimes while on supervision, strongly speaks to the necessity for a sentence of incarceration for the purposes of specific deterrence. When interviewed by law enforcement pre-arrest, Hopkins minimized his conduct and did not state that he entered the Capitol, and thus it is clear that there is a need to deter him from further unlawful conduct. However, the United States acknowledges that the defendant admitted his conduct in the post-plea debrief.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Hopkins based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Hopkins has pleaded guilty to Count 4 of the Amended Information, charging him with parading, demonstrating, or picketing inside the Capitol, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020). A defendant's different criminal history is also a legitimate consideration that supports a more severe sentence without causing disparity.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.

*See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

A defendant's entry into a sensitive space, such as the Parliamentarian's or a Senator's office, places that defendant in a more serious category of offenders than those defendants who remained in hallways or other spaces that are occasionally open to the public (although not on January 6).  One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a Member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office, and thus implicates similar concerns. For instance, Brandon Fellows, whom Hopkins took a picture of, recognized it as some sort of "Oregon room." Affidavit, *Fellows, supra*, ECF No. 1 at ¶ 15.

Hopkins's extensive and violent criminal history sets him apart from many other misdemeanor defendants who similarly pled guilty to violating 40 U.S.C. § 5104(e)(2)(G), and demands a correspondingly more significant sentence. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

1.      In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of violating 40 U.S.C. § 5104(e)(2)(G), including entering the Spouse's Lounge of the Capitol. This Court sentenced the defendant to 45 days of incarceration. Mazzocco, unlike Hopkins, had no criminal history. Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 14.

2.      In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(D), including penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced each of the defendants to 45 days of incarceration. Unlike Hopkins, Jancart's criminal history was minimal (a DUI and traffic infractions) (Gov. Sentencing Mem., *Jancart*, ECF No. 25 at 15) while Rau had misdemeanor convictions and was also on probation at the time of offense. Gov. Sentencing Mem., *Rau*, ECF No. 13 at 13. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright,* No. 21-cr-72 (CRC) (30 days incarceration, one year supervised release).

3.      In *United States v. Andrew Ericson*, 21-cr-506 (TNM) the defendant entered the Speaker's Conference Room where he posed for a selfie photograph while resting his feet on the conference table. Gov. Sentencing Mem, *Ericson*, ECF # 37 at 3. Judge McFadden imposed a

sentence of 20 days' imprisonment, discussing Ericson's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

4.      Other defendants with a significant criminal history who have pled guilty to violating Section § 5104(e)(2)(G), have also been sentenced to incarceration, such as in *United States v. Edward Hemenway*, 21-cr-49 (TSC), where this Court sentenced the defendant to 45 days' incarceration. Similar to Hopkins, Hemenway had a conviction for Sexual Battery. Gov. Sentencing Mem., *Hemenway*, 21-cr-49, ECF No. 32 at 11. Unlike Hopkins, Hemenway entered the Capitol only once and did not enter any sensitive spaces. *Id.* at 2-3.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

18

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[5]

## V.    Opposition to Transfer of Jurisdiction

The United States opposes the recommendation of the Probation Office that the jurisdiction of this case be transferred to the District of Kansas. ECF #29 at 2 (Sentencing Recommendation). To be clear, the government does not oppose the continuance of "courtesy supervision" whereby

---

[5] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

the defendant is supervised in his home district and this Court continues to have jurisdiction over the case. Ultimately, this Court has the greatest familiarity with Hopkins and his case, and is in a better position to assess the defendant and any issues that may arise during a period of supervised release or probation in the context of January 6 prosecutions and similarly situated defendants. Moreover, over the course of over one-thousand criminal cases, this jurisdiction has gained significant knowledge of the unprecedented January 6 attack on the Capitol and the ensuing prosecutions.

While the prosecution hopes that the defendant remains compliant, our position is that jurisdiction best remains with this Court. Additionally, if this Court were to sentence the defendant to any term of incarceration, a motion to transfer jurisdiction would be premature until the defendant is released. *United States v. Jones*, 766 F.App'x. 671, 674 (10th Cir. 2019) ("a transfer [under 18 U.S.C. 3605] is only possible, however, when Jones is actually released from prison").

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 4 months' incarceration, 36 months' probation, 60 hours community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Jeffrey A. Kiok_____
        JEFFREY A. KIOK

20

Attorney (detailed)
N.Y. Bar Number 5400221
United States Attorney's Office
601 D Street, N.W.
Washington, D.C.  20530
Telephone: (202) 307-5967
Email: jeffrey.kiok2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 3rd day of April 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ Jeffrey A. Kiok_____
JEFFREY A. KIOK
Attorney (detailed)
N.Y. Bar Number 5400221
United States Attorney's Office
601 D Street, N.W.
Washington, D.C.  20530
Telephone: (202) 307-5967
Email: jeffrey.kiok2@usdoj.gov